THE TERRE HAUTE AND INDIANAPOLIS RAILROAD COMPANY v. SHEEKS.

[No. 18,530. Filed Feb. 20, 1900. Rehearing denied June 19, 1900.]

PLEADING.—*Complaint.*—*Proof.*—*Recovery.* —*Secundum Allegata et Probata.*—Where the gravamen of a paragraph of complaint was that plaintiff was injured by the derailment of defendant's passenger train, upon which she was a passenger, caused by a broken rail in a certain switch, in the construction of which defendant was guilty of negligence, proof of the substance of the material issues constituting the cause of action as set out in the complaint is sufficient to sustain a judgment for plaintiff, without proof of all the particular infirmities or deficiencies alleged in the complaint relative to the construction and maintenance of the switch. *pp. 88-94.*

Terre Haute, etc., R. Co. *v.* Sheeks.

CARRIERS.—*Negligence.—Personal Injuries.*—The law exacts of a railroad company engaged in carrying passengers the highest practicable care for the safety of its passengers in the operation of its trains, and in keeping its road, machinery and appliances in a safe condition; and while the burden is upon the passenger suing for personal injuries to maintain the affirmative of the issue, the mere happening of the accident is at least *prima facie* evidence of negligence upon the part of the carrier.  *pp. 94-97.*

SAME.—*Negligence.—Personal Injuries.*—In an action against a railroad company for personal injuries sustained by plaintiff by the derailment of the car in which she was riding, caused by running the train at a very high rate of speed down a heavy grade upon a curve having near its middle an unsafe switch, the company is not exonerated of the charge of negligence by the fact that the rail which broke weighed seventy pounds to the yard, was made by a reputable manufacturer, had been in use about eighteen months, was well spiked to sound ties, had been inspected a few hours before the accident, and there was nothing to indicate but what the switch was as safe for the use of trains at the time of the accident as it was before.  *pp. 97, 98.*

SAME.—*Contributory Negligence.*—In an action for personal injuries to a railway passenger, a finding that the passenger at the time of the accident was seated in one of the seats of the chair-car, as directed by defendant's servants, and that the car was derailed and precipitated over a bank, shows an absence of contributory negligence upon the part of the passenger at the time of the accident.  *p. 98.*

SPECIAL VERDICT.—*Personal Injuries.—Aggravation of Injuries by Negligence of Plaintiff.*—A special verdict in an action for personal injuries need not affirmatively show that the injuries received were not subsequently aggravated by any negligent conduct on the part of plaintiff.  *pp. 98, 99.*

DEPOSITIONS.—*Motions to Suppress.—Irrelevancy.*—Where objections made to a deposition before trial go to the relevancy of the evidence therein, which might become relevant in any possible phase of the case, the court cannot be required to anticipate its propriety or impropriety in advance of its being offered in evidence.  If the deposition, or any part thereof, was not relevant when it was offered to be read in evidence, objections thereto at that time should have been interposed.  *pp. 99, 100.*

DAMAGES.—*Personal Injuries.—Excessive Damages.*—A judgment for $15,000 for personal injuries sustained by a passenger in a railroad accident is not excessive, where it was shown that plaintiff received a severe nervous shock which caused a deep seated disease of the nerve centers, injured her spine so that she would suffer from same

all of her life, resulting in partial paralysis of her limbs, and that by reason of such injuries she was rendered unfit to perform any labor, either mental or physical, and was so injured that she could never perform the functions of a wife or mother, and was rendered despondent so as to cast a gloom over her whole life.  *p. 100.*

From the Marion Superior Court.  *Affirmed.*

*John G. Williams, W. H. H. Miller* and *J. B. Elam,* for appellant.

*J. E. McCullough, H. N. Spaan* and *A. J. Beveridge,* for appellee.

JORDAN, J.—This action was instituted by the appellee to recover damages for personal injuries sustained by her, while a passenger, by reason of the derailment of a train.

The complaint is in five paragraphs.  The answer was a general denial.  There was a trial by jury and a special verdict returned which was framed, by means of interrogatories, under the act of 1895.  The jury assessed appellee's damages at $15,000.  Motion by appellant for judgment in its favor upon the special verdict was denied, as was also its motion for a new trial; and judgment was rendered on the special verdict in favor of appellee; and these several rulings of the court are the only errors assigned.

Each of the five paragraphs of complaint alleges that appellant is a railroad corporation and a common carrier engaged in operating a railroad in the State of Indiana; and appellee, on the 28th day of January, 1895, was a passenger on one of its trains running from the city of Terre Haute to the city of Indianapolis; and as such passenger she had paid the usual fare which entitled her to be carried to the place of her destination.

We need not recite the particular grounds of negligence upon the part of the appellant to which appellee under either the first, second, or third paragraph of the complaint, attributes the accident, or derailment of the train, for the reason that the special verdict apparently rests upon and follows substantially the material facts alleged in the fourth

paragraph of the complaint, and also in the fifth paragraph, so far as they relate in the latter to the derailment of the train in question being due to a defective and unsafe switch constructed and maintained by the appellant.

The fourth paragraph charges negligence upon appellant's part as follows: "That on the line of said railway, to wit, at or near the town of Coatesville, the defendant had, prior to the 28th day of January, 1895, negligently and carelessly constructed a switch, and was on said day, carelessly and negligently maintaining said switch thus carelessly and negligently constructed; that the defendant was guilty and negligent in the maintaining of said switch in this, to wit, the rails constituting the said switch, or movable portion of the track, and which are moved to the one side or the other according as the train was intended to be run on the main track or the side-track, should be securely connected, the one with the other, by a proper number of iron bars extending from the one to the other of such movable rails, and securely fastened to each, to the end that said movable rails should be securely fastened in their position in regard to each other; that there should be a sufficient number of bars thus connecting such movable rails, extending from the point where such movable rails join to the one connecting the track to the hinge where they are attached to the other of the connecting tracks, so that if either of the movable rails should be broken by or in the passage of the trains over the same, yet, notwithstanding such break in such rails, each piece thereof would be held in a firm position parallel to the other of said movable switch rails, and the train not thrown from the track; that such movable rails should be connected by such tie-bars at a point very near to each end of said movable rails, and at such intervening distances between such tie-bars thus near the ends of such rails as will effectually hold such movable switch rails firmly parallel to each other; or, in the event one of said rails shall be broken, hold the two pieces thereof

parallel to the rail which has not been broken. The plaintiff avers in this case that the defendant, notwithstanding it well knew that the said switch should have been constructed as above described, wholly failed and neglected so to do, but, on the contrary, negligently and carelessly constructed said switch as follows: It placed on the inside of each of said movable rails, and at a distance of two or three inches therefrom, a guard-rail which was bolted through three cast iron fill blocks, some two or three inches in width, to the said switch rails, such guard-rails being those bolted to such switch rails at three points,—the first at a point a few inches from the free end of such switch rails, the second four feet therefrom, and the third four feet from said second point; that the outer point of such guard-rails extended a few inches out and beyond the free ends of said movable switch rails; that there were no tie-bars whatever connecting such movable switch rails, the only tie-bars used in the construction of such switch being the tie-bar connecting the ends of such guard-rails at a point outside and beyond the free ends of said switch rails, which tie-bar was also used as a throw bar to throw the switch from the one side to the other, according to whether the train was intended to run upon the main or side-track; that the said movable rails in said switch were nineteen feet long; that by reason of the construction of said switch in the manner just indicated for a great distance, to wit, ten feet from the hinge end of said movable switch rails, there was nothing whatever to hold the pieces of such switch rails, in the event of their or either of them being broken, parallel to each other, so as to prevent a train from running off the track of the said road, in the event that each of such switch rails should be broken; that by reason of the manner in which said switch had been constructed and was being maintained, the same was dangerous and defective, and that if either of the rails constituting the movable portion of said switch should be broken between the hinge end thereof and the attachment of said switch rail to said guard-

rail, at the nearest point thereto, by or in the passage of a train of cars over the same, there would be great danger that all the cars of said train behind the one thus breaking said switch rail would be thrown from the track. And the plaintiff further shows that on the said 28th day of January, 1895, she was a passenger upon one of defendant's trains running over said portion of said road; that when said train came upon said switch, the engine upon said train, or some of the cars in said train in front of the car in which the said plaintiff was riding, broke one of the rails in said movable portion in said switch, at a point between the hinge end thereof and the point of its nearest attachment to said guard-rail, and, thereupon, and by reason thereof, the car in which this plaintiff was riding was with great force and violence thrown from the track, broken, and overturned, and that thereby this plaintiff was thrown with great force and violence upon and against the sides of said car, etc."

The fifth paragraph charges the negligence and the happening of the accident as follows: "That on said day said defendant was guilty of negligence in the operation and maintenance of its said road, and in the running of its said train over the same in this, to wit: That it negligently and carelessly erected a defective and dangerous switch on a curve in the line of its said road at or near the town of Coatesville, which switch was defective and dangerous in this, to wit: That the movable rails constituting the switch point, which are movable to the one side or the other, as desired, so as to cause the train to pass upon the one track or the other, as desired, were not properly held or fastened securely in their position with relation to each other, and so that if either rail should be broken the pieces thereof would be held in their position parallel to the other rail; that, on the contrary, said switch was so negligently and defectively constructed that if the engine or cars, forming the front portion of a train of cars, should break one of the switch rails, the portion of the train behind the engine or

cars thus breaking such rail would be thrown from the track." This paragraph then proceeds further to allege as negligence upon the part of the appellant, first, that it used rails that were not sufficient to bear the trains and engines which were used by appellant in operating its road; second, that the engine in use upon the occasion of the accident was too heavy and too high, etc.; third, that the train, at the time it was derailed, was being run at a rate of speed far in excess of what was safe and prudent under the existing condition of things as therein set forth. The paragraph, continuing, charges: "That by reason of said negligent and careless conduct on the part of defendant, when the train in which this plaintiff was riding came upon said curve and switch, at or near the town of Coatesville, the car in which this plaintiff was riding was thrown with great force and violence from the track, and was broken and overturned, and that thereby this plaintiff was thrown with great force and violence upon and against the sides of said car," etc.

Eliminating from the special verdict facts or matters which may be said to be of an evidentiary character, and also what may be considered as mere conclusions upon the part of the jury, it may be said to embrace the following facts: On January 28, 1895, defendant was a common carrier of passengers for hire, and was operating a railroad between Greencastle and Indianapolis. The plaintiff, on that day, after procuring a ticket entitling her to ride on a train known as number twenty on said railroad, became a passenger on that train at Greencastle with the intention of riding to Indianapolis. This train was a fast passenger train, which left Greencastle about 2 o'clock p. m., and for at least two years had passed over defendant's road about the same time of day, made up substantially in the same way, and on January 28, 1895, consisted of about the usual number and about the same kind of cars, except that the private car of the president was attached to the rear of the train. The train was composed of an engine weighing 139,000

pounds, a tender, two mail cars, a combination car, and five other cars, one of the five being a chair-car, and plaintiff was injured by reason of the derailment of part of the train. At the time of this derailment, plaintiff, as a passenger, was seated in one of the seats of the chair-car, as directed by the servants of the defendant, and that car was derailed, thrown from the track, precipitated over a bank and turned over. At the time of this derailment the train was running at a high rate of speed on a curved track, in a generally eastern direction, and the derailment and precipitation of the car down the bank was caused by the breaking and displacement of the north rail of a switch in the track at the point where the derailment occurred. Each of the rails in this switch was straight from end to end, but at the point where it was maintained there was a curve amounting to about two degrees. A train approaching this switch from the west would descend a continuous and heavy grade on a straight track from a point at least one-half mile west of said switch to a point about three hundred yards west of said switch, and then descend a continuous heavy grade upon a curved track to a point at least two hundred yards east of the switch.

On January 28, 1895, the switch in question was constructed as follows: On the inside of each of the movable rails of said switch, parallel therewith, and at a distance of two or three inches therefrom, there was a guard-rail of sufficient length to receive the bolts hereinafter described. The guard-rail was bolted through three cast iron fill blocks, some two or three inches in thickness, to the switch rail, such guard-rails being so bolted to said switch rails at three points,—first, at a point some few inches from the movable end of such switch rails; second, at a point some four feet from the movable end of the switch rails, and third, at a point some four feet from the said second point, with the outer point of such guard rails extending a few inches east

of it and beyond the movable end of such switch rail, and with a tie-bar connecting the east end of said guard-rails at a point east of the east end of such switch rails, which tie-bar was also used to throw the switch from one side to the other, and no tie-bar whatever connected such movable switch rails or guard-rails, except the tie-bar at the end of the guard-rails above described.

At the point where this switch was maintained there was a side-track extending westward therefrom on the north side of the main track, and the west end or hinge end of the south rail of the switch connected with the south rail of the side-track, and the west end or hinge end of the north rail of the switch connected with the north rail of the main track, so that when the movable end of the switch was thrown to the north, a continuous line was formed from the main track, and with a train of cars passing from west to east on the main track, the north wheels of the train would run upon and along the north switch rail, and the south wheels along the south rail of the main track.

To secure reasonable safety in the operation of railroad trains, it is necessary to have the rails spiked to the ties on both sides at every eighteen or twenty inches, or, at the very most, about twenty-five inches. This is done, first, to prevent the rail from breaking, and, second, in a case of break, to prevent the displacement of the rail and the consequent derailment of the cars. It is not a fact that, where rails are secured and held by spikes, or, in case of switches by the tie-bars, there may be frequent breaks in the rails of a track without the derailment of the train of cars passing over such break.

In the construction of a switch it is ordinarily proper, to secure safety, so to fasten the two rails of the switch as to make them as rigid as possible. When a switch in a railroad track is used for passing fast trains over it, it is necessary, in order to secure reasonable safety, that the rails of such switch, if nineteen feet long, should, by means of tie-bars,

at distances of not more than four feet apart, be secured, to prevent breaking and displacement of the rails and consequent derailment of the cars. At the time the cars in question in this case were derailed—on January 28, 1895, there were not any tie-bars connecting the two rails of the switch in question except the throw bar at the east end of the guard-rail, and for the whole length of the switch rail in question, to wit, nineteen feet, there was nothing that would prevent its displacement if it broke under a train. For ten feet of the switch rail in question there was nothing to prevent its being broken by a lateral pressure of the train, except the strength of the rail.

Steam was operating on the engine as the train in question approached said switch from the west on the day and trip of said derailment, and as it came down the grade and onto the switch; and when the train came upon said switch it was running at a rate of fifty miles, which was a higher rate of speed than its usual rate. The train was nineteen minutes late when it struck said switch, and its regular schedule time required it to run forty-five miles an hour. The locomotive engine which was drawing the train in question was extraordinarily large and heavy.

A sufficient number of tie-bars connecting the rails of a switch will not prevent a lateral movement of the rails. The switch in question was not so constructed as to prevent as much as possible such lateral movement, considering the necessity for moving the same. The evidence shows that when the track rails of the main track were properly spiked it is only very rarely that a broken rail will cause a train of cars to leave the track. A switch over which fast trains are run should be so constructed as that the rails composing the switch will be held as nearly as possible in place if a break should occur in one of the switch rails. The switch in question in this case was not so constructed. The derailment of the cars in question in this case was caused by the defendant running a very heavy passenger train at a

very high rate of speed down a heavy grade upon a curve, having near its middle an unsafe switch. Said switch was located upon an embankment about ten feet high, at a place where there was a one-degree curve in the railroad track, the inner or shorter side of said curve being on the south side of the track. This curve was a light one.

The switch in question consisted, in part, of two movable rails, each nineteen feet long, connected with other rails of the track at the hinge end of the switch, and securely fastened to ties and the rails with which they connected. The point where these rails were so connected is called the heel of the switch, and the switch rails extended eastward from that point. Towards their eastward end said rails were planed off so as to be brought to a sharp point at the east end. This tapering point was about eight feet long from the place where the rail began to taper to the extreme sharp point thereof, and said planed or beveled part of the north movable rail was brought alongside and against a rail of full size when the switch was shifted to the north. The planed or beveled part of the south movable rail was brought against another rail of that size when the switch was shifted to the south. These planed and smaller portions of said switch rails were reënforced by rails of full size fastened thereto at intervals of about three feet, and extending from the sharp point westward about eight feet. The portions of the switch rails from the west end of said reënforcing rail to the heel of the switch were secured by spikes driven into the ties, and placed as near the rail as they could be driven and still allow the movement necessary in shifting a switch.

At the time of the accident the north movable rail of said switch was shifted to the north so that the planed portion of it came against a rail of full size, and that portion of said north rail between the west end of the reënforcing rail and the heel then rested against the spikes driven into the ties along the north side of said portion of said rail. The movable rails of said switch were tied together by a connect-

Terre Haute, etc., R. Co. v. Sheeks.

ing bar near the east end thereof attached to the reënforcing rails. Said switch was known as a Channel split switch.

The accident was caused by a break in the north rail of said switch about eight feet from the heel thereof. There was no flaw in the rail at that point. A number of trains, including number twenty, had run over said switch each day for more than two years while it was placed and constructed as it was at the time of the accident. There was nothing in the condition and appearance of said switch rail to indicate that there was any more danger of its breaking at the time of said accident than there had been since it had been in use at said place. The snow had been swept from the switch about two and a half hours before the accident, and there was then nothing in the appearance of the switch at the time of the accident to indicate that it was not as safe as it had been before that time. There was nothing in the appearance of the switch at the time of the accident to indicate that it would not carry trains as it had been doing before.

At the time of the accident there was not any known means of preventing rails of a railroad from breaking. The probability of such breaking is greater in cold weather. The 28th day of January, 1895, was a cold day. The thermometer on that day indicated a temperature of ten degrees above zero. The switch rails in said Channel switch were made by the Carnegie Steel Company, of Pittsburgh, which was a reputable manufacturer of such rails. If a rail in a railroad track is broken upon a straight track, such breaking will sometimes derail a train. For more than three years the defendant, upon different parts of its railroad, had used a number of Channel switches of the same pattern with the one that broke at Coatesville, and laid in the same manner, and, under the evidence in this case, there was nothing developed by the use of said switches during the time named to suggest they were an unsafe kind of switch. The rails in the track at and near the point where said accident occurred were steel rails of the weight of seventy pounds per

yard. The rails constituting the switch were placed there in the summer of 1893, and there was nothing before the happening of said accident to indicate that they were not heavy enough for the use to which they were put, nor was there anything before said accident to indicate that such rails would not safely carry the train and engine that were running over them at the time of the accident. The rail at the point it broke was a full sized rail, weighing seventy pounds to the yard.

The defendant had in its employ, at and immediately before the time of the accident, a sufficient and competent force of men charged with the duty of inspecting said switch and the track in the neighborhood thereof, and keeping them in proper condition. The section foreman having such portion of said railroad in charge inspected said switch about 8:45 a. m. on the day of the accident, and at that time said switch was in good condition and repair. One of the employes of defendant, belonging to the section force employed upon the section of defendant's road where said switch was placed, swept the snow from said switch at about 11:45 a. m. on the day of the accident, and at that time moved the east end of the switch backwards and forwards from north to south and from south to north, and said switch upon being so moved worked properly.

Said switch rails were full spiked to sufficient ties. Said ties were new and sound, and the railroad at the point where said switch was placed was well ballasted. The main track of defendant's railroad, east and west of said switch, and in the neighborhood thereof, was full spiked to good ties and well ballasted.

Said train was derailed immediately at the east end of said switch, and towards the south side of the railroad track. At the time of its derailment the train was not running at its usual schedule rate. This schedule rate was not too high for reasonable safety. Up to the time of the accident nothing had been developed in the operation of defendant's

railroad to indicate that such schedule time was too high for reasonable safety. There were, in all, eight cars in the train, of which four at the rear of the train were derailed. The accident happened about 2:19 p. m.

At the time the cars were derailed, the plaintiff was seated in the chair-car next to the rear seat of the car. She was thrown about against the various objects in the car, and in such manner that when she became conscious she was at the front end of the chair-car. When she first became conscious she could not see or feel, but she feared, and had reason to fear, that the car was on fire. The horrors of her situation when she became conscious gave her such a nervous shock as to tend to bring about a deep seated disease of the nerve centers. Because of the injury she received at the time of said derailment she has become permanently lame in her right leg, so that probably she will have to walk on crutches the rest of her life; and her spine has become permanently injured so that she will suffer more or less therefrom all her life. She has become wholly unfit to perform any labor, either mental or physical, because of the injuries received at said time. She was so badly injured that she can never perform the function of a wife or mother. These conditions are permanent. Her injuries have rendered her despondent, so as to cast a gloom over her whole future life. Her lower limbs have become partially paralyzed because of the injury to her spine; her left arm has become partially useless by reason of her injuries so received at said time; she suffers at times with violent pains in her head and back because of such injuries received at said time, and for the same reason she is sleepless and restless; her right limb is very much shrunken, both above and below the knee; she suffers constantly from inability to breathe properly; is subject often to muscular tremors; has lost her appetite; the actions of her heart and bowels are seriously interfered with from time to time; she has been reduced in weight from 120 pounds to ninety pounds. She was in

perfect health just before she was injured as aforesaid. At the time of her injury her income from acting as a trained nurse and giving massage treatment, and other matters, was at least $800 a year. The regular pay of a trained nurse is from fifteen to twenty-five dollars per week, according to the kind of case she is employed in. From the time of the injuries until now the plaintiff has required the attendance of two nurses, alternately, her mother and her sister. A reasonable compensation for such nursing is $1,000. The plaintiff, since her said injuries, has been totally and continuously disabled from work; has suffered great pain of body and distress of mind because of such injuries, and all of such injuries were caused to plaintiff by being precipitated in said car over and down said embankment.

It is insisted by appellant's learned counsel that their motion for judgment on the special verdict ought to have been sustained, and the motion of appellee for judgment thereon in her favor should have been denied,—first, because the facts found are not sufficient to authorize the conclusion, as a matter of law, that appellant was guilty of negligence, as charged in the complaint; second, because the facts are not sufficient to authorize the conclusion, as a matter of law, that there was absence of contributory negligence upon the part of appellee; third, that appellee must recover, if at all, upon the theory presented by her complaint, and that the facts contained in the special verdict do not sustain the theory of her complaint. Therefore, it is contended that the verdict was not sufficient to support a judgment for appellee on either the fourth or fifth paragraph of the complaint. They concede that, had appellee's complaint, by simple averments, disclosed that she, on the day named, having paid the required fare, became a passenger on one of appellant's trains, to be carried to a certain point, and that, during her passage, the train upon which she was being carried had been derailed, and thrown down a steep embankment, by reason whereof she sustained severe and

permanent injuries, as alleged, all without any fault whatever upon her part, but being due solely to the negligence of appellant, that, on the trial, under the issues joined upon such a complaint, proof of the derailment of the train would be sufficient to make a *prima facie* case of negligence against appellant, and "a complete defense to the action could only be made by showing that the accident was one that could not have been prevented by the exercise of that high degree of care which the law requires of a carrier of passengers."

No such cause of action, it is said, as would have been stated under such general averments is presented by the complaint in this case, for the reason that, under each of its paragraphs, the negligence complained of is minutely and specifically stated; and appellant was therefore called upon to defend only against the particular negligence charged; and the right of appellee to recover depended upon satisfactory proof being made by her that appellant was guilty of negligence, as charged in her complaint.

It is further claimed that whatever right of recovery she may have, under the facts stated in the verdict, must rest exclusively either upon the fourth paragraph of the complaint or upon that part of the fifth paragraph which charges negligence upon the part of appellant in the use of an unsafe or dangerous switch. In support of this argument, counsel insist that the special verdict will not support the judgment for appellant upon the fourth paragraph, for the reason that it "presents the theory that appellee was injured by the derailment of the car in which she was riding; that this derailment was caused by the displacement of a piece of a rail which broke under the forward part of the train, and this displacement would not have occurred, if, in the performance of its duty, appellant had been using a switch of the kind it is declared appellant was in duty bound to use. No case is presented by this paragraph of failure to use a switch that would prevent, *as nearly as possible,*

the displacement of the pieces of the broken switch rail. The theory is that appellant was required to use the switch described in that paragraph, which, it is averred, should have been constructed with tie-bars in a manner that would 'effectually hold such movable switch rails firmly parallel to each other; or, in the event one of such rails shall be broken, hold the two pieces thereof parallel to the rail which has not been broken.' "

Continuing, counsel insist that the issues thus presented must not be confused with one involving the question whether or not appellant was using a switch of such a kind as that in the event one of the switch rails should break under a passing train the pieces thereof "would be held, *as nearly as possible,* in place and *as nearly as possible* parallel with the other switch rail". Upon this view of the case the insistence is that the principal question to be tried and determined, under the issues joined upon the fourth paragraph, was: "Can a switch, by the use of a sufficient number of tie-bars, be so constructed as that any displacement of the pieces of a rail that breaks under a passing train will be prevented and the train be not thrown from the track?"

It is conceded that possibly appellee may contend that the special verdict discloses that the train, upon which she was a passenger at the time of the accident, was derailed, and that the injuries of which she complains were thereby inflicted; therefore, under the rule applicable to cases by a passenger against a carrier, the derailment in question would raise a presumption of negligence against appellant, to the extent that reasonable safety required the use of tie-bars in switches, to prevent, as much as possible the breaking and displacement of the switch rails; that the switch in question had no tie-bars, and was not constructed in a manner that would prevent, as much as possible, lateral motion of the switch; and therefore the facts found by the verdict are sufficient to authorize the conclusion that appellant's negligence caused the injuries mentioned in the complaint.

It is contended, however, that upon this view of the question the verdict does not embrace facts sufficient to support a recovery, for the reason that the presumption of negligence, arising out of the derailment of the train, is entirely destroyed or overcome by other facts embraced in the verdict.

Counsels' interpretation of the fourth paragraph of the complaint, in respect to its theory and the burden which it cast upon appellee, can not in reason be tenable. It can not be successfully asserted that because she by her complaint has been more particular and specific in describing the deficiencies of the switch in controversy than was necessarily required, therefore she can not recover unless she proves all the particular defects as charged in the complaint. Reduced to a simple proposition, the gravamen of the fourth paragraph of the complaint may be said to be that, while the relation of passenger and carrier existed between appellee and appellant, she was injured by the derailment of the train upon which she had taken passage; that the derailment was due to a broken rail in a certain switch located on appellant's road near the town of Coatesville, in the construction and maintenance of which switch appellant was guilty of negligence. It can not be said that the complaint charges only specific acts of negligence, and none in general. It is true that appellee was not content to stop at the general averments of negligence in respect to the switch which caused the accident; but she proceeded to particularize or point out with more precision than was required, under the circumstances, the deficiency of the switch which rendered it unsafe.

Ordinarily, a complaint, under the rules of good pleading, is required to be particular enough to apprise the defendant of the substantial case which the plaintiff will seek to establish upon the trial; and such a general statement of facts, either in a complaint or answer, as will admit of almost any proof, is bad pleading. In cases like the one at bar,

where the relation of passenger and carrier existed at the time of the accident, less certainty or particularity, in charging the negligence to which the injury sustained is attributed, is required than is in cases of a different character arising out of negligence. The principal reason which supports this rule is obvious. The carrier is presumed to be familiar with its own road and also with the appliances and means employed in the operation of its trains and the transportation of passengers over its road. All of these are considered to be matters peculiarly within the knowledge of the carrier; and when a passenger sues for an injury sustained by him on account of an accident due to the negligence of a carrier in the operation of its trains, or to its negligence in the construction and maintenance of its road, or to its negligence in the use of appliances or means of transportation, it is not incumbent upon him to state in his complaint the particulars constituting the negligence of which he complains. *Louisville, etc., R. Co.* v. *Hendricks*, 128 Ind. 462; *Anderson* v. *Scholey*, 114 Ind. 553; *Cincinnati, etc., R. Co.* v. *Chester*, 57 Ind. 297; *Clark* v. *Chicago, etc., R. Co.*, 15 Fed. 588; Thompson on Car. p. 547, §9; *Ware* v. *Gay*, 11 Pick. 106; *Eldridge* v. *Long Island R. Co.*, 1 Sand. (S. C.) 89; *Allender* v. *Chicago, etc., R. Co.*, 37 Iowa 264.

It certainly can not be true, as counsel for appellant seemingly contend, that, under either the fourth or fifth paragraph of the complaint, the principal question to be decided upon the issues joined thereon was: Could a switch, by the use of a sufficient number of tie-bars, be so constructed that any displacement of the pieces of the switch rail, when broken by a passing train, would be prevented? Upon this assumption counsel advance the argument that, in order to recover, appellee must prove that the switch in question could and ought to have been so constructed that the rails thereof would have been securely fastened in their position to each other, so that in the event either of the rails broke under a train, the pieces of such broken rail would be held in their position and prevent a derailment of the train.

Terre Haute, etc., R. Co. *v.* Sheeks.

It is then asserted that, inasmuch as the special verdict does not disclose that it is possible to construct such a switch, but does show that it is impossible to do so, it must follow that the appellee has failed to maintain her action.

We concede the contention of appellant's counsel that it is a familiar rule that a plaintiff must recover *secundum allegata et probata.* The recovery, if at all, must be upon the cause of action stated in the complaint, and where the court or jury finds upon a cause substantially different from the one alleged in the complaint, the plaintiff will fail. But it must be remembered that there is another familiar rule of practice which authorizes a recovery when the plaintiff has proved the substance of the material issues constituting the cause of action set forth in his complaint.

One of the essential issues under either of the above mentioned paragraphs is: Was appellant's road, at the time of the accident, unsound and unsafe by reason of the defective switch which is alleged to have caused the derailment by reason of its broken rail? This evidently is the theory upon which each of these paragraphs proceeds. It is true that the essence of the infirmity imputed to the switch by the particular averments of the complaint is a deficiency of iron bars connecting the movable rails.

The charge in the paragraphs mentioned, to the effect that the negligence of appellant arises out of its constructing and maintaining this switch in a defective and unsafe condition, possibly, under the circumstances, had the effect of relieving appellant on the trial from meeting or attempting to disprove any other negligence in regard to the derailment of the train, for the reason that appellee, having charged appellant with being alone guilty of negligence in respect to the switch, would, upon the trial, be confined to that theory, and could not rely upon other grounds of negligence as the result of the accident. Upon no view of the case can it be said, we think, that appellee, in order to succeed, must prove all of the particular infirmities or deficien-

cies alleged in regard to the switch. As heretofore stated, proof of the essence or gravamen of her cause of action would be sufficient. The facts alleged in the complaint, disclosing as they do the relation of passenger and carrier, also the occurrence of the accident and the injuries sustained by appellee thereby, enable her to avail herself of the benefit of the rule which authorizes, upon the consideration of such facts, the presumption of negligence upon the part of the carrier. The charge as to appellant's negligence in the construction and maintenance of the switch was notice to it to bring forward facts to show that there was no negligence in this respect, but it certainly can not be affirmed that, by the particular averments in her complaint, she thereby relieved appellant of the burden of showing, under the circumstances, what the law exacted of it.

The duty of a railroad company engaged in carrying passengers is one well defined. While the company, as a carrier of passengers, is not an insurer of their safety, still, in consideration of the great danger to human life consequent upon the neglect of duty upon the part of the company, the law exacts of it the exercise of the highest practicable care for the safety of its passengers in the operation of its trains, and in keeping its road, machinery, and appliances in a safe condition; and for any failure to exercise such care, and for a slight neglect of its duty in this respect, it is liable to a passenger, who is himself without fault, for an injury sustained as the result of such negligence. *Louisville, etc., R. Co.* v. *Hendricks*, 128 Ind. 462; *Louisville, etc., Ferry Co.* v. *Nolan*, 135 Ind. 60, and cases there cited; 4 Elliott on Railroads, §§1586, 1587, 1588, 1589.

Of course, where one sues a railroad company for injuries received, through its negligence, while a passenger on its train, he has the burden of proving negligence and all of the other material facts which constitute his cause of action; and this *onus*, as we have already said, rested upon appellee. By reason of the high degree of care and dili-

gence which a railroad company is required, at its peril, to exercise for the safety of its passengers, another well settled rule heretofore mentioned, in regard to the presumption of negligence in cases like this, obtains. This presumption is said to arise against the carrier where an accident happens on its road by which a passenger receives an injury by derailment of a train or breaking down of its road bed, carriages, equipments, or other appliances owned or controlled by such company and used by it in the operation of its road. While the burden is upon the passenger suing to maintain the affirmative of the issue, still, under such circumstances, the mere happening of the accident is at least *prima facie* evidence of the negligence upon the part of the company or carrier, and it will be incumbent upon the latter to produce evidence which will excuse the *prima facie* failure of duty on its part; or, in other words, it has the burden of proving, in order to rebut the presumption of negligence, under the circumstances, that the accident could not have been avoided by the exercise of the highest practical care and diligence. *Pittsburgh, etc., R. Co.* v. *Williams,* 74 Ind. 462; *Memphis, etc., Co.* v. *McCool,* 83 Ind. 392, 43 Am. Rep. 71; *Terre Haute, etc., R. Co.* v. *Buck,* 96 Ind. 346, 49 Am. Rep. 168; *Bedford, etc., R. Co.* v. *Rainbolt,* 99 Ind. 551; *Cleveland, etc., R. Co.* v. *Newell,* 104 Ind. 264, 54 Am. Rep. 312; *Louisville, etc., R. Co.* v. *Jones,* 108 Ind. 551; *Anderson* v. *Scholey,* 114 Ind. 553; *Louisville, etc., R. Co.* v. *Snyder,* 117 Ind. 435, 10 Am. St. 60, 3 L. R. A. 434; *Louisville, etc., R. Co.* v. *Hendricks,* 128 Ind. 462; *Louisville, etc., R. Co.* v. *Miller,* 141 Ind. 533; *Edgerton* v. *New York, etc., R. Co.,* 39 N. Y. 227; Elliott on Railroads, §1644; Hutchinson on Car., §800; Thompson on Car., pp. 210, 211; *vide* authorities collected in note to *Farish* v. *Reigle,* 62 Am. Dec. 679.

In *Edgerton* v. *New York, etc., R. Co., supra,* the reason for the rule is aptly stated as follows: "Experience proves that when the track and machinery are in this con-

dition, and prudently operated, the trains will keep upon the track, and run thereon with entire safety to those on board. Whenever a car or train leaves the track, it proves that either the track or machinery, or some other portion thereof, is not in a proper condition, or that the machinery is not properly operated, and presumptively proves that the defendant, whose duty it is to keep the track and machinery in the proper condition, and to operate it with the necessary prudence and care, has, in some respect, violated this duty."

In *Louisville, etc., R. Co.* v. *Jones*, 108 Ind. 551, the rule in question is expressed as follows: "When the plaintiff made it to appear that she was a passenger upon appellant's train, and, while being carried as such, the car in which she was seated left the track and she suffered injuries thereby, she had shown a state of things upon which a presumption of negligence arose against the railroad company, which stood with the force and efficiency of actual proof of the fact, and was available for her benefit until negatived and overthrown, and that such presumption can only be overthrown by proof that the casualty 'resulted from inevitable or unavoidable accident, against which no human skill, prudence or foresight, as usually and practically applied to careful railroad management, could provide.'"

The cause of action alleged in the fifth paragraph of the complaint, so far as the issue of negligence is charged to arise out of the construction and maintenance of the defective and unsafe switch, is substantially the same as that alleged in the fourth paragraph of the complaint; and upon such issue, as well as others, the special verdict may be said to respond to the cause of action alleged in either of these paragraphs. If either of these paragraphs can be said to state a good cause of action, in respect to the issue of negligence upon the part of appellant, which its counsel does not deny, it is evident, then, that the facts embraced in the verdict, when tested by the well settled principles of law

to which we have referred, establish that issue in favor of appellee.

It is not necessary that we give an extensive review in this opinion of the facts disclosed by the verdict. It is sufficient to say that there are facts stated therein, among others, which unquestionably show that appellant, at and previous to the accident, was a common carrier of passengers, engaged in operating a railroad; that the relation of carrier and passenger existed between it and appellee; and that the latter was injured by reason of the derailment of a train upon which she had taken passage. The accident, as the facts disclose, was caused by the breaking and displacement of one of the rails of a switch on appellant's railroad at the place where the derailment of the train occurred. The facts further disclose that appellant had failed to exercise that high degree of care and diligence, which the law exacts, in the construction and maintenance of the switch so as to secure the reasonable safety of the passage of trains thereover.

When the facts in respect to the happening of the accident, and the cause thereof, are considered and tested by the rule previously asserted in regard to the presumption arising therefrom, which rule, it may be said, is applicable in cases of this kind, in determining the sufficiency of a special verdict, to support a judgment in favor of the plaintiff therein, it certainly is apparent that the facts, at least substantially, establish in favor of appellee the issue of negligence alleged in her complaint. The facts in the verdict, which may be said to be most favorable to the appellant, fall short, we think, of excusing or exonerating it of the charge of negligence established against it by the verdict. It is apparent from the facts found that everything in regard to the unsafe condition of appellant's road, at the point of the accident, could have been as well ascertained before the accident as after, had appellant exercised, under

the circumstances, the care and diligence required. There
was no flaw in the broken rail, as the facts show, and it
does not appear in any manner that the infirmities of the
switch were, prior to the accident, in any manner latent or
hidden from the observation of appellant's servants. It is
true that it appears, as insisted, that the rail which broke
weighed seventy pounds to the yard, and was made by a
reputable manufacturer; that it had been in use about
eighteen months, and was well spiked to sound ties, and
there was nothing to indicate, at the time of the accident,
but what the switch was as safe for the use of trains at that
time as it was before. It further appears that the switch
had been inspected but a few hours before the accident oc-
curred. Giving these facts and others all the force that
can be legitimately claimed for them, they fail to establish
that the accident was unavoidable or could have been pre-
vented by the exercise of the highest practicable degree of
care and diligence in the construction and maintenance of
the switch in controversy. Certainly these facts can not
in reason be held, in view of the well settled and control-
ling rules heretofore mentioned, to be sufficient to over-
come the negligence against appellant under the facts set
out in the verdict. The burden, as heretofore said, rested
upon appellant to establish facts which would overcome or
disprove the negligence which the facts in the verdict es-
tablished. In this it has clearly failed. The special ver-
dict discloses that at the time of the accident appellee as a
passenger was seated in one of the seats of the chair-car,
as directed by appellant's servants, and that this car was
derailed and precipitated over the bank. It is virtually
conceded by appellant's counsel, and properly so, we think,
that these facts, under the decision in the appeal of
*Louisville, etc., R. Co.* v. *Miller*, 141 Ind. 533, 553, show
that, at the time of the accident, there was an absence of
contributory negligence upon the part of appellee.

It is insisted, however, that the verdict must go further,

and also affirmatively show that the injuries which she received, by reason of the accident, were not subsequently aggravated by any negligence or conduct on her part. If appellee, by her negligence, after receiving the injuries due to the accident, aggravated the same, or omitted, under the circumstances, to exercise ordinary care to cure and restore herself, these were manifestly matters of defense, and the burden of proving them was upon appellant. *City of Goshen* v. *England*, 119 Ind. 368, 5 L. R. A. 253.

The case of *Wabash R. Co.* v. *Miller*, 18 Ind. App. 549, is not an authority in support of appellant's contention. In that case the question involved did not pertain to the aggravation of damages, but, under the facts therein, it related to the care which the plaintiff was required to exercise in the first instance in order to prevent damages. It must follow, and we so adjudge, that the court did not err in rendering judgment in favor of appellee on the special verdict.

It is next contended that the court erred: (1) In denying appellant's motions, made in advance of the trial, to suppress in whole and in parts the deposition of Charles W. Cornwell; (2) that the verdict of the jury is contrary to the evidence; (3) that the damages are excessive. In regard to the motions to suppress the deposition in question, each of them assigned as a reason and proceeded upon the theory that, because the deponent had visited the place of the accident sometime after its occurrence, and, at the time of such visit, made the measurements and inspections to which he testified, and because the deposition disclosed that the situation between the time of the accident and the visit of the deponent had changed, therefore it was insisted that the deposition as a whole and in part ought to be suppressed as the evidence was not relevant. No objections appear to have been made to the deposition when it was offered and introduced in evidence.

Where the objections made to a deposition before a trial

go to the relevancy of the evidence therein, which might become relevant in any possible phase of the case, the court can not be required to anticipate its propriety, or impropriety, in advance of its being offered in evidence. *Worley* v. *Hineman*, 6 Ind. App. 240, and cases there cited.

If the deposition or any part thereof was not relevant when it was offered to be read in evidence, objections thereto at that time should have been interposed. No available error, under the circumstances, can be predicated upon the ruling of the court in denying the motion to suppress the deposition.

We have read and considered the evidence, and are satisfied that it fully supports all of the material facts found in the verdict in favor of appellee, and we would not be justified in disturbing the judgment upon the ground that it is contrary to the evidence. The facts in the verdict which disclose the injury, suffering, and permanent disability and lamentable condition of the appellee, as results of the accident, her previous earning capacity, etc., are all sustained by the evidence. In consideration of these facts and matters, we would not be justified in adjudging that the damages are excessive. The assessment in question is not so large, under the circumstances, as to induce the belief that the jury, in fixing the amount, was actuated by prejudice, partiality, or corruption. *Illinois, etc., R. Co.* v. *Cheek*, 152 Ind. 663.

There is no available error, and the judgment is, therefore, affirmed.