UNION TRACTION COMPANY OF INDIANA *v.* MORRIS.

[No. 23,735. Filed October 24, 1922. Rehearing denied June 5, 1923.]

1. CARRIERS.—*Negligence.*—*Derailment of Cars.*—*Prima Facie Evidence.*—The derailment of a passenger car resulting in injury to a passenger makes a *prima facie* case of negligence against the carrier, requiring proof by the carrier that the accident could not have been avoided by the exercise of reasonable care and diligence. p. 324.

2. TRIAL.—*Evidence.*—*Competency.*—Evidence that is competent for one matter of proof is not incompetent because it affects another element of the case. p. 325.

3. APPEAL.—*Review.*—*Admission of Evidence.*—On appeal, it will be held that evidence admitted by the trial court which is competent for one matter of proof was permitted to go to the jury to prove such matter, and not to prove some other matter for which it would be incompetent. p. 325.

4. DAMAGES.—*Personal Injury.*—*Evidence.*—*Nervous Condition.*—In an action for damages because of a personal injury, it is not improper for the plaintiff, in testifying as to his resulting nervous condition, to state that he experienced a "dread" of going back to his former duties and concentrating his mind

upon his work, where he had previously testified that, since the accident, when he did so, he was nervous and experienced an overwrought condition which made it impossible for him to sleep at night.   p. 325.

5.   APPEAL.—*Review.—Excessive Damages.—Rule Stated.*—An appellate tribunal will not reverse a judgment because of excessive damages unless the damages awarded appear, "at first blush", to be outrageous and excessive, or it is apparent that some improper element of damages has been taken into consideration by the jury in determining the amount, or that evidence was admitted which clearly prejudiced the minds of the jurors and caused them to be partial to the plaintiff. p. 326.

6.   DAMAGES.—*Not Excessive.*—A verdict of $9,000 for broken arm and general bruising and shock, resulting in severe suffering for a long time and nervous condition which prevented sleep and which caused inability of plaintiff to concentrate his mind on his work as formerly, is not excessive.   p. 327.

From Grant Circuit Court; *J. F. Charles,* Judge.

Action by Robert A. Morris against the Union Traction Company of Indiana.   From a judgment for plaintiff, the defendant appeals.   *Affirmed.*

*J. A. VanOsdol, Kittinger & Diven* and *Condo & Browne,* for appellant.

*Miller & Matterson, Branyan & Branyan* and *Alfred Hodgston,* for appellee.

TRAVIS, J.—Action by appellee against appellant to recover damages for a personal injury which resulted from the derailing and turning over of appellant's interurban passenger car, named and known as the "Marion Flyer", in which appellee was a passenger.

Appellant was the owner of and operated its interurban railway between the cities of Indianapolis and Wabash, which railway line passed through the city of Anderson.   March 22, appellee purchased a ticket from appellant at its station in Indianapolis to Fairmount, a town on its railway north of Anderson, and boarded appellant's car, the "Marion Flyer", at Indianapolis, and did not leave the car until after the accident and

injury to him. As the car was approaching Anderson, and on the outskirts of that city, a fire occurred in the roof of the car at the rear, which was caused by the electric current. The car was stopped, the trolley pole detached from the trolley wire, and the fire extinguished. The trolley was thereafter placed on the trolley wire and the fire again started. Thereafter, the trolley pole was anchored to the top of the car, so that the electric connection was broken, and there was no electric connection between the trolley wire and this car during the remainder of the journey, from the time of the fire to the time of the accident. At the time the fire took place, another of appellant's interurban cars appeared coming on the track in the rear of the "Marion Flyer", which other car was a Muncie car. Some member of the crew of the "Marion Flyer" had a conversation with the crew of the Muncie car, about what was to be done; whether the passengers ought to be transferred from the "Marion Flyer" to another car, or to push the "Marion Flyer" car into Anderson by the Muncie car. Finally, however, the Muncie car, which had a "pointed nose", as expressed by one of the witnesses, and without being attached to or connected with the "Marion Flyer", pushed it into Anderson and until the happening of the accident, which power was the only power that operated the "Marion Flyer" from the time of the fire in its roof to the time of the accident. The "Marion Flyer" was a heavy car, weighing between forty and fifty tons, and was equipped with air brakes, which air brakes were operated from air tanks; the mechanism or valves of the apparatus of such air brakes permitted the use of what is known as direct air, and an emergency air brake, which also aided and assisted in reversing the car when necessary. The car was also equipped with a hand brake. Because of the current being disconnected from the car by reason

of the trolley pole being anchored, the machinery necessary to compress more air into the tanks could not be operated, and no air was compressed into the tanks after the trolley pole had been anchored down at the beginning of the journey of the car after the fire. The topography of the city of Anderson is uneven, and, in the course of appellant's railway line over the streets of the city, there are many grades, two of which were quite steep hills. The last one, at the foot of which the accident occurred, has a grade of from 2 to 4 per cent. decline, and the other one in the city of Anderson is still steeper. During the passage of the car through the city of Anderson up and down its grades and down the two hills in question, under the propelling force of the Muncie car, the air brakes of the "Marion Flyer" had been used 10 times previous to the attempted use of them in coursing down the hill between Ninth street and Fifth street, where the accident occurred. Down the steeper hill mentioned, the air was used to check the speed of the car going down the hill, and also to prevent colliding with an automobile. The air was also used to regulate the speed of the car, to stop the car at the regular stops, and in going around curves at the corners. The motorman of the "Marion Flyer" testified that it would decrease the pressure of air 3 pounds in stopping the car. The car was successfully stopped at the several places mentioned during the course of its journey after the fire up to its stop at Ninth street, which is at the top of the last hill mentioned. After taking off and taking on passengers at this stop, the Muncie car again pushed it until it reached the brow of the last hill, and it was able to descend by its own weight. The car was due in Anderson at 6:18, and the accident occurred about 6:40. During the whole course of the "Marion Flyer" after the fire, and until the accident, there was no head-light upon the car or

interior lights. The Muncie car was lighted, but at the rear. It was raining. During the course of the journey of this "Marion Flyer" through Anderson it stopped at Eleventh and Meridian streets, which was opposite a high building known as the Union Block, at which point someone called from the window in the building and asked if there was plenty of air, to which the motorman replied that there was 60 pounds of air at that time, and the man in the building who asked about the air said, "Go ahead and transfer at the switch." Another witness testified that the man who gave the order was the dispatcher, who also said to the motorman, "Let her coast down to the junction." In connection with these statements, it was further testified that there was further conversation by the railroad employees as to whether they would transfer the passengers there or go down to the switch and transfer the passengers there to another car and go on to Marion. The car was well filled with passengers in the smoking compartment and the rear compartment, and one passenger was riding in the baggage compartment, who was with and talked to the motorman in the descent of the car down the last hill at the foot of which the accident occurred. At this point in the journey, the evidence of the motorman showed that the air gauge showed fifty pounds of air. He also testified that fifty pounds of air was sufficient to operate the car successfully and safely down this hill, but that it was an unusual thing to do, and also that he had observed that air brakes failed to work when there was a large quantity of air and large pressure of air in the tanks, and that he had seen such brakes work perfectly immediately before and after having such experience. There was one other witness who testified as an expert motorman and who had formerly been in the employ of appellant as a motorman, and who had been under such employ

as motorman of the "Marion Flyer" from Indianapolis to Anderson, and who had theretofore operated the identical car to which the accident happened. The following question was asked of this witness: "Q. Assuming that the car was in good condition, the equipment of the brake, and had only 50 pounds of air in it, state whether or not in your opinion that is a safe amount of air to carry that car at a reasonable and safe rate of speed down that hill in the city of Anderson from Ninth on Main street toward Fifth street, assuming the car is in good condition and the equipment is in good condition?" To which question, he answered, "No, I would not," and the next question, "Why not?" answered, "Because it wasn't enough air." Appellant's witness, the motorman of this car at the time of the accident, testified that the normal amount of air to carry was eighty to 110 pounds, and that, at the time of the fire in the car, as near as he could tell, there was 100 pounds of air pressure, and from there to Eleventh and Meridian streets; the air pressure had decreased to sixty pounds. During its descent, the car was scheduled to stop at Seventh street. The car gained momentum as it proceeded down the grade, which gain in speed the motorman endeavored to check by the use of the air brakes. He turned the lever of the direct air, but the brakes did not set. He tried it again, but the brakes did not respond. Next he tried the automatic or emergency brake, which is a part of the air brake mechanism, and gives a greater pressure of air than straight air, but it did not respond. This car was so equipped that it could be reversed by the use of compressed air and without electric current—without the electric connection through the trolley pole, as testified to by the motorman who was in charge at the time of the accident, but he did not try to use this device. After trying the air brake on the direct air

without success, the motorman tried the hand brake, but it would not stop the car, did not even decrease the speed. The car gained momentum continuing down the hill until it reached the foot of the hill where the track divides, one track making a curve into a cross street which is Fifth street, and the other which goes nearly straight ahead. The switch was opened so that the car was turned onto the curve which turns into Fifth street. The car had gained such momentum down the hill that the car itself left the trucks and rolled over and across the north side of Fifth street, until it collided with, and was stopped by, and leaned against, a factory building on the other side of Fifth street.

Appellee was forty-two years of age, and previous to the accident was a healthy man and had had no illnesses, save la grippe, for many years preceding the accident, and his activities in the management of the bank were interfered with only by an occasional nervousness due to overwork. Just previous to the accident, during the rapid descent of the car down the hill, the appellee became frightened and arose from his seat, but was thrown violently back into his seat, which was just before the car struck the curve and was thrown across the street and off its trucks. The appellee was assisted out of the car, placed in a conveyance and taken to the hospital at Anderson, where he remained for thirteen days, after which he was removed to his home at Fairmount, eight miles distant. The injury to appellee caused by the accident was a diagonal fracture of the humerus of the left arm about midway between the shoulder and elbow. The left shoulder was bruised, as was also the left knee, and, according to the evidence of the appellee, he was bruised generally all over from being rolled about in the car and from being struck by the other passengers as they were hurled against and upon him when the car was turning over.

The appellee was in very great pain at the time he reached the hospital, and he was given medicines, two occasions hypodermically, that evening at the hospital before the surgical operation to reduce the fracture. For the surgical operation, the appellee was anaesthetized, the result of which caused him great distress and suffering. In the reduction of the fracture, splints were placed upon the arm from the shoulder to the wrist and bound very tightly with bandages. The day following the fracture, it was determined by the physicians in charge to make an x-ray examination of the wound, and appellee was taken to the x-ray room and placed upon the table to be thus examined. It was found that the x-ray machine was out of order, and appellee was taken back to his own quarters until the machine had been placed in order, after which he was again taken to the x-ray machine room and placed upon the table. And after being examined by this apparatus, he was again anaesthetized, which was between one and two o'clock in the afternoon and kept under an anaesthetic until nearly five o'clock in the afternoon for the operation. The taking of the anaesthetic at this time resulted in distress and suffering by appellee. Each day thereafter until the removal of the splints, the binding around the arm was tightened, which tightening caused intense pain to appellee. About the time he was ready to leave the hospital, the splints were removed and the injured arm was placed in a plaster cast from the shoulder to the wrist. The cast caused additional pain and suffering and the arm swelled to such an extent that it was necessary to remove the plaster cast, and it was removed and a new cast put on. These plaster casts were changed from time to time, but continued upon the arm until about May 25, when the casts were permanently removed. Thereafter, the patient carried his arm in a sling for some weeks.

During all of the time from the time of the accident until the removal of the arm from the sling, the injury caused appellee much pain. He could get but very little sleep on account of the pain. He suffered a severe shock on account of the accident, the result of which accompanied him from the date of the accident, which, together with the pain, caused him to be nervous. He was under a physician's care for this nervousness for a long period of time, running over many months, during which time he was advised by his physician to go to another city to a sanitarium for treatment and rest, which he did. Appellee prior to the date of the accident was cashier of the bank at Fairmount, and had been such cashier for many years. Appellee began sometime in the month of April to go to the bank and partially assume some of his work as such cashier, increasing the time he spent at the bank as time progressed. He was very nervous at the time he undertook to resume his work and at one time had a nervous collapse so that he was confined to his bed. In relation to his nervous condition, he testified that there never had been a time that he had been free from this nervous condition; that because of the sleeplessness and the condition of mind that followed it, he had been experiencing a feeling of dread of assuming the responsibilities he ordinarily did, and that he had a feeling of dread of concentrating his mind upon matters which required concentration. He was given additional help when he returned to his duties after the accident.

At the request of appellant, the court appointed two physicians to make an examination of the appellee, which witnesses gave evidence concerning their examination of appellee at the trial. The evidence disclosed that the left arm, after it had mended from its fracture, was from one-half to three-fourths of an inch short.

The left elbow was three-eighths to one-half of an inch larger than the right elbow, and the left biceps one-half an inch larger than the right biceps. There was one inch deficiency in the extension of the arm. The left hand was slightly deficient in grasp. There was a slight tremor in the left hand. The motion of the injured arm backward was twenty-five per cent. deficient. The appellee was nervous and had pain which could be due to neuritis, irritation of the nerve; and that the injury to the shoulder might be responsible for that condition. The musculospiral nerve winds around the upper left arm and extends along it, but is separated from the bone of the arm. If this nerve was close to the fracture, it would be responsible for the pain. At any rate, the nervousness was caused by the accident, and the nervous condition was permanent.

The complaint in one paragraph was founded upon the alleged negligence of appellant in carelessly, negligently, and improperly operating said car; and in negligently failing to maintain said car and the equipment by which the same was operated and controlled, in a reasonably proper and safe condition; and in failing to enforce proper rules and regulations in the operation and management of said car; and in failing to install, maintain, and use proper apparatus to control said car, and in using insufficient and worn out and defective cars and improper apparatus; and that the car at the time and place of the accident was in a defective and unsafe condition.

The trial of the issue formed by appellant's answer in general denial of the complaint, resulted in a general verdict by the jury for the appellee in the sum of $9,000. Appellant's motion for a new trial was overruled by the court and judgment rendered, from which appellant appealed.

The only error relied upon for reversal of the judg-

ment is: the court erred in overruling appellant's motion for a new trial. The reasons relied upon for a new trial are:    (1) The verdict of the jury is contrary to law; (2) the verdict of the jury is not sustained by sufficient evidence; (3) the damages assessed by the verdict are excessive; and (4) for errors of law in the introduction of evidence over the objections of appellant.

Appellant points out and discusses two reasons only upon which to base the reversal of the case, viz.:    (1) The verdict is not sustained by sufficient evidence and is contrary to law; and (2) the damages awarded are excessive.

The position taken by appellant, as disclosed by its argument, is that *res ipsa loquitur* does not apply, for the reason, as urged, that the cause of the injury complained of was purely accidental, and was not due to its negligence. Appellant takes the position that all it was charged with looking after, was fifty pounds air pressure in its tank of air, and that having had, as shown by its evidence, fifty pounds pressure behind the air brakes at the top of the hill, and that when the motorman turned on the air during the descent, the brakes failed to work, appellant was absolved from having inquired into or taken cognizance of the performance of any other way by which the accident might have been averted. If this were the only possible theory in explanation of the accident, and through which alone the accident was caused, appellant would then be in a position to ask to be placed under the protection of the rule of law it cites, which is, that if the injury were occasioned solely by an unvoidable accident, it would not be held liable for such injury.

The care commensurate with the danger in this case brings into question the use of this dead car for the carrying of passengers at all; and especially down

steep grades, when only part of the apparatus for
1. stopping the car or retarding its speed with which
this car was equipped could be used, or was
used. Therefore it was incumbent upon appellant to
prove by competent evidence that the accident could.
not have been avoided by the exercise of reasonable care
and diligence under the circumstances, in order to rebut
the presumption of negligence established by the *prima
facie* evidence of the mere happening of the accident.
*Terre Haute, etc., R. Co.* v. *Sheeks* (1900), 155 Ind.
74, and cases there cited.

Appellant claims the damages are excessive, for the
reason that the verdict is so extravagant as to lead to
the conclusion that the jury was subject either to im-
proper influence, prejudice or partiality; and that, even
though it should be contended that the damages are not
excessive, the assessment of damages was aggravated
by certain evidence admitted over appellant's objection.

The evidence complained of was, that as the car was
being pushed through the city of Anderson, and at the
stop in front of the Union Block, the dispatcher called
from the window in the building to the motorman and
said, "Let her coast down to the junction"; and because
another witness, who had been an employee of appel-
lant, in the capacity of a motorman, and who had oper-
ated its cars but four months prior to the accident,
answered, that fifty pounds air pressure by which to
operate the air brakes, was insufficient to manage the
car at a safe rate of speed down the hill from Ninth
street on Main street toward Fifth street in the city of
Anderson; and because of an answer given by the ap-
pellee concerning his condition, in which answer he
said, that because of his sleeplessness and a condition
of mind that followed, he had been experiencing a feel-
ing of "dread" of assuming his ordinary responsibilities.

It was seriously contended at the trial, and no less

so on appeal, that it was error for plaintiff's witness to relate the conversation had between some one in 2, 3. the Union Block, before which the car stopped, and the motorman, in which he said, "Let her coast down to the junction." The objection to the question was, that it had not appeared yet in evidence that the two people concerned had had a conversation, and that the conversation pertained to the line of their respective duties, and also that the person who called to the motorman had not been identified as the dispatcher and an employee of appellant. This was corroborated by the evidence of another witness, though in different language, and without objection by the appellant. And which evidence goes to prove further that the only way this car could be managed down any descent was by permitting it to coast, that it was without power and that the car crew had in mind the probability that it might be best to transfer the passengers from the dead car, even though there was more than fifty pounds pressure of air in the tanks at this point in the journey. If the evidence was competent for one matter of proof, it was not incompetent because it affected another element of the case. It is reasonable to infer that the evidence was not given with any intent to aggravate damages, but to show negligence; and it is a reasonable inference to believe that the trial court permitted it to go to the jury for the reason that it concerned the operation of the car, to show whether such car was being operated negligently, or not.

Appellant maintains that by the use of the word "dread" in the answer made by appellee concerning his condition the damages were aggravated. It is 4. not unreasonable to see that one who had been through a terrible accident, and who had been badly injured and frightened, and who was convalescing, which convalescense had been long drawn out,

and who was suffering from nervousness and lack of sleep, would be loath to start into the regular work he had been doing previous to the injury. The witness dreaded to come in contact with his former regular line of duties, and had a feeling of dread of concentrating his mind upon the matters which, previous to the accident, had required concentration of mind, because of the fact that, since the accident, when he did so, he was nervous, and experienced an overwrought condition which made it impossible for him to sleep at night. By the use of this word he sought to explain and show his nervous condition. A different word than "dread" might have been used by appellee to explain the condition and feelings which he experienced, but it is necessary to take people as they may be found, and to give some latitude for one as a witness to express himself with the vocabulary with which he is equipped. If appellee had not recovered sufficiently at the date of the trial to be in as good condition as he was previous to his injury, it was proper for the jury to know it; and it was not improper for the witness to say, in answer to the question, that he experienced a feeling of "dread" of assuming responsibilities, and of concentrating his mind upon matters which required concentration.

The rule of law is, that a court of appellate jurisdiction will not reverse the judgment of the trial court in refusing to grant a new trial because of excessive damages, unless the damages assessed appear to be outrageous and excessive, or that it is apparent that some improper element had been taken into consideration by the jury, in determining the amount. *Cleveland, etc., R. Co.* v. *Hadley* (1907), 170 Ind. 204, 16 L. R. A. (N. S.) 527, 16 Ann. Cas. 1.

The extent of the injury as a basis for damages was for the jury to determine. The setting and incidents of the trial, as well as the conduct and appearance of

witnesses were all before the trial judge, on account of which he was best fitted to determine whether the verdict of the jury was subject, either to improper influence, prejudice, or partiality; and because the trial judge had these matters before him when he passed upon the motion for a new trial, which was based upon these causes, it would be an abuse of appellate power to disturb the judgment because of excessive damages unless it were made clearly to appear that improper influence had been used upon the jury, or that evidence had been admitted which clearly prejudiced their minds and caused them to use partiality, or that, at first blush, the damages appeared to be grossly excessive, or so out of line with reason and justice, as to shock the conscience. *City of Evansville* v. *Worthington* (1884), 97 Ind. 282; *Louisville, etc., R. Co.* v. *Miller* (1895), 141 Ind. 533; *Cleveland, etc., R. Co.* v. *Harrison* (1912), 178 Ind. 324; *Jeffersonville Mfg. Co.* v. *Holden* (1913), 180 Ind. 301; 4 C. J. 873.

The verdict is sustained by sufficient evidence, and is not contrary to law. The damages awarded by the jury are not excessive; neither were the damages aggravated by the evidence in response to the challenged questions.

Judgment affirmed.